FILED

2022 Jul-12  AM 10:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **NORTH FACE CONSTRUCTION, LLC,** } | |
| } | |
| **Plaintiff,** } | |
| } | **Case No.: 2:20-cv-00165-MHH** |
| **v.** } | |
| } | |
| **CITY OF BIRMINGHAM, ALABAMA,** } | |
| | |
| **Defendant.** | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In January 2019, after a period of heavy rain, a section of the City of Birmingham's retaining wall at the bottom of North Face Construction, LLC's property "failed" and slid down the slope toward the street below. The movement of the wall and the earth behind it made the adjacent street buckle and damaged the City's right of way. At the time, North Face had nearly completed construction of an apartment building on its property, and the slope failure jeopardized the stability of the new building. North Face and the City blame one another for the wall's failure, but North Face repaired the damage under a reservation of rights letter because the City threatened to withhold North Face's occupancy permit if North

Face did not complete the repairs.  North Face needed the wall repaired quickly to help secure its new apartment building.

To recover its expenses for the wall's repair, North Face asserts against the City a takings claim, substantive and procedural due process claims, an unjust enrichment claim, and a claim for breach of the duty of lateral support.[1]  The Court held a bench trial to resolve North Face's suit against the City.  Consistent with Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.  FED. R. CIV. P. 52(a)(1).

### Findings of Fact – Background

1. Ben Miree is the sole member of North Face Construction, LLC.  North Face owns property at 2205 16th Avenue South in Birmingham, Alabama.  (Doc. 26, p. 2, ¶ 5; Doc. 90, p. 2).  The property "slopes downward relatively steeply from south to north," and there is a retaining wall at the bottom of the slope that "runs along the north property line along 16th Avenue South."  (P's Ex. 70).  North Face constructed a 4-unit apartment building on the property at the top of the slope.  (P's Exs. 54, 55, 57).

2. The City owns the retaining wall along 16th Avenue South, and the wall is located in the City's right of way.  (Doc. 89, p. 1, ¶ 2).

3. Fred Hawkins, the City Engineer during the North Face construction project, testified that the City does not know who constructed the retaining wall or when it was constructed.  Mr. Hawkins believes the retaining wall is at least 50 to 60 years old.  Before January 2019, the City had not inspected the wall or performed maintenance on it.[2]

---

[1] North Face voluntarily dismissed two other claims in the amended complaint.  (Doc. 26).

[2] A transcript of the bench trial testimony is available upon request.  Should either party appeal, the Court will issue a supplemental opinion with citations to the official transcript when the transcript is added to the record.

4.  As early as January 12, 2016, North Face was aware of an approximately 2-inch crack in the City's retaining wall. (P's Ex. 70). Mr. Miree believed that the crack was caused by the growth of a tree next to the wall and pressure on the wall from the tree's root system. North Face cut down the tree and attached a metal plate to the wall to cover the crack. (D's Exs. 23, 43). North Face did not notify the City of the crack or the installation of the metal plate on the retaining wall.

5.  In an August 15, 2016 pre-construction affidavit that North Face submitted to the City, Mr. Miree certified that he had been "retained to periodically observe and inspect the actual construction of the new footings, foundations, and retaining walls, but not the two pre-existing retaining walls and their foundations . . . ." (P's Ex. 3).

6.  North Face began constructing the apartment building on its property after the City issued a building permit on January 3, 2017. (P's Ex. 6).

7.  The City had notice of North Face's intent to clear vegetation from the slope above the retaining wall and approved the clearing. (P's Exs. 28, 29). North Face received a "soil erosion permit (clearing and grading)" on December 22, 2016. (P's Exs. 4, 5).

8.  Between January and April 2017, North Face cleared and graded the slope above the retaining wall. During this time, the vegetation on the slope was removed and the ground left exposed. Mr. Miree testified that North Face removed 8–10 large trees from the slope but left the roots in the ground. After North Face finished the clearing and grading, North Face immediately reseeded the area with sod. In Plaintiff's Exhibit 54, photographs taken in April 2017 show the slope above the retaining wall covered with grass and the tree stumps in the ground. (P's Ex. 54). The slope was reseeded more than 1.5 years before January 2019.

9.  City inspectors occasionally visited the building site; they did not express concern about or criticize North Face for the slope clearing.

10. Approximately 1.5 years before January 2019, North Face added fill dirt above the retaining wall.

11. Between December 27, 2018 and January 4, 2019, the National Oceanic & Atmospheric Administration (NOAA) recorded 7.73 inches of rain at the

Birmingham airport. (Doc. 89, p. 1, ¶ 4). By comparison, the three-decade average of precipitation at the Birmingham Airport is 4.45 inches for the month of December and 4.84 inches for the month of January. (P's Ex. 25, pp. 1–2).[3]

12. On January 2, 2019, the retaining wall beneath North Face's apartment building and the dirt behind the wall began sliding down the hill towards 16th Avenue South. The wall moved at a rate of 4 to 6 inches per day and moved a total of approximately 6 feet. The wall pushed against the adjacent sidewalk and street and caused 16th Avenue South to buckle and crack. As a result, the retaining wall, the sidewalk, the street, the curb, and the gutter next to the property were damaged. (D's Exs. 16, 19, 23, 30, 51, 52, 71).



---

[3] Between December 27, 2018 and January 4, 2019, NOAA recorded 8.87 inches of rain at its Cahaba Pump House location. Between December 27, 2018 and January 4, 2019, NOAA recorded 7.99 inches of rain at its Mountain Brook location. (Doc. 89, p. 2, ¶¶ 5–6).



North Face Constr v. City of Bl
2:20-CV-00165-MHH-
Date  5/10/2021
Defendant Exhibit Label No. 5

13. All sections of the City's retaining wall other than the section below North
    Face's construction site remained stable in the rain event.

5

14. North Face blocked off 16th Avenue South and notified the City of the wall movement.[4]

15. The City informed North Face that it was responsible for repairing the wall failure.  Mr. Miree asked the City to put the information in writing.

16. Before sending a demand letter, the City did not retain an independent engineer to perform an analysis of the wall failure, and the City did not perform an internal engineering analysis.  The City did not inspect the retaining wall following the rain event.  At the time of the demand letter, the City did not know the retaining wall's dimensions. [5]

17. On January 18, 2019, the City sent North Face an "official demand" to "repair the city infrastructure."  (P's Ex. 9; D's Ex. 1).  In the letter, the City stated that North Face's construction activities were responsible for the damage. The City listed "contributing factors causing damage" which "may include" the "[c]learing of all vegetation including large trees and ground cover above the retaining wall" and "[p]lacing additional fill [dirt] above the retaining wall."

18. In the demand letter, the City cited the General Code of the City of Birmingham, Alabama Sec. 4-5-40, which states:  "Damage to city streets during construction; restoration required."  This code section allows the City to refuse to issue a permit if a developer fails to make repairs and fails to reimburse the City for those repairs.  In the letter, the City did not offer North Face a way to challenge the City's determination that the company was at fault.

19. By January 2019, North Face had completed nearly 95% of its construction project and had spent over $2,000,000 on the project.  North Face had a lease

---

[4] As discussed below, the City contends that the wall did not fail.  According to the City, the wall remained upright and simply moved with shifting earth as part of a global stability failure.  The Court uses the term "wall failure" in a general sense to address the retaining wall's shift in January 2019 and the damage to the surrounding area.  The City also labels the incident as a "wall failure" and as a "failing wall."  (P's Ex. 11, pp. 4–5).

[5] Mr. Hawkins testified that he believed the wall was moving before the rain event and that he spoke to Mr. Miree about it several weeks and possibly months before the City sent its demand letter.  Evidence in the record and testimony from Mr. Miree and Mr. Eddington supports the conclusion that the parties first discussed the wall issue after the rain event in early January 2019.

with a tenant for occupancy beginning February of 2019. According to Mr. Miree, Mr. Hawkins informed him that North Face would not receive an occupancy permit unless the company completed the repairs. According to Mr. Miree, Mr. Hawkins explained, "That's [the] only leverage I got."

20. Relatedly, in October 2018, because it believed that North Face's heavy construction equipment tore up parts of 16th Avenue South, the City asked North Face to repave the road. Mr. Hawkins sent an email stating: "We will be holding all final C.O.'s until the final paving is completed." (P's Ex. 8, p. 1). "C.O." is an abbreviation for certificate of occupancy.

21. On January 26, 2019, North Face responded to the City's demand letter. (P's Ex. 10). North Face indicated that the "repair resulting from the failure of the wall [was] the responsibility of the City," and that "the design and construction of the subject wall was defective . . . ." North Face stated:

> The wall failure has also jeopardizes [sic] the stability of our building which is almost complete. In light of the City's position, we have no choice under this circumstance, but to take immediate emergency steps to stabilize our building. . . . While we will be forced to bear the cost of this work initially, we will look to the City for reimbursement if our position is ultimately found to be correct.

22. North Face stabilized its building, built a new section of retaining wall to replace the section that failed, and repaired damage to city infrastructure near the new section of retaining wall. (P's Ex. 57; D's Exs. 8, 9). On June 30, 2019, North Face sent a letter to Mr. Hawkins to inform the City that the repairs were complete. North Face wrote: "Although we objected, we had no choice but to proceed in light of your vow to withhold an occupancy permit on our project adjacent [to] the city's right of way as the only leverage you had to force compliance." (P's Ex. 21).

23. North Face spent $588,124 to build the new section of retaining wall and concrete buttresses and to repair 16th Avenue South, the gutter, the sidewalk, the curb, and damage to water utility lines. (Doc. 89, p. 1, ¶ 3).

24. North Face received an occupancy permit for the property on August 15, 2019. (P's Ex. 23).

### *Findings of Fact – Wall Failure*

25. Water is often the primary catalyst to wall failure.  Water has pressure but no strength, so adding water to a slope greatly increases driving forces without a reciprocal increase in resistance.

26. Stewart Lee, the structural engineer for the North Face project, testified that weep holes in the City's retaining wall were clogged and did not allow water to properly drain.  Weep holes are small holes in retaining walls that allow water to escape from behind the wall.  Without functioning weep holes, water may build up behind a wall and increase the pressure against the wall.  The City's wall had soil directly behind it rather than gravel, which made it more difficult for water to drain from behind the wall.

27. Alain Gallet, North Face's expert geotechnical engineer, modeled the stability of the slope of North Face's property under pressure from varying levels of ground water.  (P's Ex. 34).  Mr. Gallet began by modeling the slope under dry conditions.  He made four other calculations by progressively increasing the ground water level until the ground water reached the slope surface.  Mr. Gallet demonstrated that as ground water level rises, the slope's factor of safety decreases.  Therefore, a period of significant rainfall would increase the ground water level and decrease the stability of the slope.

28. Mr. Gallet's calculations for slope stability ranged from 1.169 in dry conditions to 0.566 with a high level of ground water.  (P's Ex. 34, pp. 1–5).  According to Mr. Gallet, a value of 1.0 is imminent slope failure.  A value below 1 means that there is slope failure, and a value above 1 means that the slope is relatively stable.  Ideally, the factor of safety should be in the range of 1.3–1.5.

29. Based on Mr. Gallet's model, in all scenarios where the ground water level reaches the base of the retaining wall or higher, the calculated factors of safety indicate that slope failure is imminent or will occur.  (P's Ex. 34, pp. 2 (F of S = 1.061), 3 (F of S = 0.952), 4 (F of S = 0.847), 5 (F of S = 0.566)).

30. The heavy rainfall in Birmingham, Alabama between December 27, 2018 and January 4, 2019 increased the water pressure behind the wall and increased the ground water level.  As the water level rose, slope failure became more likely.

31. Mr. Gallet acknowledged that the wall failure was consistent with a global stability failure, meaning failure of the entire slope.  North Face asserts that retaining walls should be designed to withstand global stability failures.

32. North Face attributes failure of the City's retaining wall under pressure from heavy rainfall to several aspects of the wall's design.  When North Face excavated the City's retaining wall to replace it, Mr. Miree drew a diagram of its dimensions.  (P's Ex. 32).  The City's retaining wall was 12 feet tall with a four-foot-wide footing.  The retaining wall had no keyway.



33. A retaining wall footing is made of concrete and placed below ground level. The footing spreads the concentrated load from the wall across an area of soil. A keyway is an anchor-like protrusion into the soil at the bottom of the footing.

34. According to the 1952 Concrete Reinforcing Steel Institute (CRSI) handbook, which often is used by structural engineers, the footing for a 12-foot retaining wall should be 8'10" wide and have a keyway that is 1'1" wide and deep.  (P's Ex. 47; *see also* P's Ex. 44).  The Alabama Department of Transportation standards indicate that a 12- to 14-foot retaining wall should have a footing that is 9'6" wide and a keyway that is 11" wide and deep.  (P's Ex. 36, p. 2; *see also* P's Ex. 44).





35. Because the City's 12 foot retaining wall had only a four-foot-wide footing and no keyway, the wall did not meet the 1952 CRSI standards or current Alabama Department of Transportation standards. The specifications to which the City's wall was built are unknown.

36. The presence or absence of vegetation above a retaining wall is not a factor that engineers consider when designing retaining walls.

37. Mr. Lee, North Face's structural engineer, performed an analysis using the retaining wall dimensions to calculate factors of safety for wall stability without pressure from the rain event. (P's Ex. 33, p. 1). The factor of safety for wall "sliding" was 0.77, and the factor of safety for "overturning" was 0.94. Both factors indicate that the wall was unstable. In Mr. Lee's opinion, an acceptable factor of safety is 1.5.

38. The City's expert, Blaise Fitzpatrick, performed factor of safety calculations using the data that Mr. Lee used. Mr. Fitzpatrick calculated a factor of safety of 0.62 for wall sliding and 0.53 for wall tipping. Mr. Fitzpatrick agrees that a factor of safety of 1 means imminent wall failure, and a factor of safety less than 1 means wall failure.

39. The calculations by Mr. Lee and Mr. Fitzpatrick seem to indicate that wall failure was a foregone conclusion, but there are several inconsistencies within the data. For example, both experts' values for overturning were less than one, which indicates failure. But as the section of the City's wall below North Face's construction slid toward 16th Avenue South during the rain event, the wall section remained upright; it did not tip over. And, if a factor of safety less than 1 indicates failure, then how did the City's wall stand for 50 to 60 years before North Face began its construction project, and why did only the section of wall below North Face's construction slide during the rain event? Based on the experts' calculations, the City's retaining wall should have failed when it was built or soon after. In addition, the experts' calculations were based on dry conditions, so every rainfall in Birmingham over the past 50 to 60 years should have compromised the wall.

40. Mr. Fitzpatrick attributed the discrepancies to incorrect soil parameters used in the calculations. The calculations used a reconstituted soil sample rather than a natural soil sample, which may not have had the same strength properties as the natural soil.

41. The City emphasizes that the wall section below North Face's construction slid as part of a global stability failure. According to the City, the wall "did not actually fail, but rather shifted along with the surrounding dirt." (Doc. 90, p. 4). The City asserts that clearing the vegetation on the slope and adding fill dirt, in addition to a large amount of rain, caused a "global landslide failure."

42. According to Mr. Fitzpatrick, a sliding failure of the wall would be localized to the wall itself. On the other hand, a global stability failure would involve the whole mass of material behind and in front of the wall.

43. Mr. Fitzpatrick testified that the "head scarp," or the top of the global stability failure, occurred at the top of the slope underneath the foundation of North Face's apartment building. The global stability failure moved from the top of the slope down into the street, carrying the wall with it.

44. A global stability failure may be caused by the steepness of a slope, a change in loading on a slope, the infiltration of moisture into a slope, and changes of environment on a slope.

45. Removing vegetation from the slope increased the chance of a global stability failure. Clearing a slope and disrupting root systems increases the amount of

water infiltration into the ground and decreases slope stability. Although reseeding the slope in April 2017 mitigated the damage, changing the environment of the slope after 50 to 60 years likely contributed to its destabilization.

46. Adding fill dirt above the retaining wall also increased the likelihood of a global stability failure. In four of five of Mr. Gallet's models, adding an amount of fill dirt above the retaining wall slightly decreased the factor of safety for slope stability. (P's Ex. 34, pp. 6–9).

47. The combination of an unusually large amount of rainfall in a short period of time and North Face's construction activities caused a global stability failure of the slope above the retaining wall.

48. The global stability failure resulting from the rainfall and North Face's construction activities caused the section of retaining wall below North Face's construction to separate from the rest of the wall, and the pressure behind the wall pushed the wall section into 16th Avenue South, causing damage to the City's infrastructure.

### Conclusions of Law[6]

#### Estoppel

As a preliminary matter, North Face argues that the City should be "estopped

from contending that North Face caused the wall to fail by clearing . . . vegetation

---

[6] North Face appears to bring its constitutional claims under 42 U.S.C. § 1983, the federal statute that provides a remedy for the deprivation under color of state law of "'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). Although North Face has not cited § 1983 in its amended complaint, North Face does request fees under § 1988. (Doc. 26, pp. 5–6, 9). "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978). This Court may exercise jurisdiction over North Face's constitutional claims, brought under § 1983, under 28 U.S.C. § 1331, and the Court has supplemental jurisdiction over North Face's related state law claims under 28 U.S.C. § 1367. *See Doe v. Fulton-DeKalb Hosp. Auth.*, 628 F.3d 1325, 1327 n.2 (11th Cir. 2010).

and adding fill dirt." (Doc. 91, p. 6). North Face asserts that because the City gave

North Face a clearing and grading permit, the City cannot contend that clearing and

adding fill dirt caused the wall failure. (Doc. 91, p. 7). Generally speaking,

> There is a kind of evidential estoppel which, though it may not amount
> to a complete estoppel in pais, is raised when persons who have spoken
> or acted one way under one set of circumstances, and with one objective
> in mind, undertake under other circumstances and when their objective
> has changed, to testimonially give a different color to what they
> formerly said and did.

*Holly Hill Citrus Growers' Ass'n v. Holly Hill Fruit Prods., Inc.*, 75 F.2d 13, 17 (5th

Cir. 1935).[7]   "[T]he elements of federal common law equitable estoppel in this

circuit are: '(1) the party to be estopped misrepresented material facts; (2) the party

to be estopped was aware of the true facts; (3) the party to be estopped intended that

the misrepresentation be acted on or had reason to believe the party asserting the

estoppel would rely on it; (4) the party asserting the estoppel did not know, nor

should it have known, the true facts; and (5) the party asserting the

estoppel reasonably and detrimentally relied on the misrepresentation.'" *Dawkins v.*

*Fulton Cty. Gov't*, 733 F.3d 1084, 1089 (11th Cir. 2013) (quoting *Busby v. JRHBW*

*Realty, Inc.*, 513 F.3d 1314, 1326 (11th Cir. 2008)).[8]

---

[7] The Fifth Circuit's *Holly Hill* decision is binding precedent. *See Bonner v. City of Prichard*, 661
F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding that decisions of the former Fifth Circuit
issued before October 1, 1981 are binding precedent for courts in the Eleventh Circuit).

[8] Under Alabama law, the "essential elements of equitable estoppel are: (1) The person against
whom estoppel is asserted, who usually must have knowledge of the facts, communicates
something in a misleading way, either by words, conduct, or silence, with the intention that the

To evaluate North Face's estoppel argument, the Court must examine the nature of municipal permits.   Under Birmingham's municipal code, the City's obligation with respect to permits is limited:

> The purpose of permitting plans and specifications is to assure compliance with [Article B, Permits and Plans, of Chapter 7, Soil Erosion and Sediment Control, of Title 4, Municipal Services, of the Birmingham General City Code]. The city engineer's review and permitting of plans and specifications is not intended as approval of the overall layout, structural design, grading procedures, situation control, engineer's reports or construction procedures. These responsibilities shall remain with and be those of the owner or his consultants. . . . If the city engineer is satisfied that the work described in an application for permit and the plans and specifications filed therewith conform to the requirements of this Code and other pertinent laws and ordinances, that the fees specified in section 203 have been paid and necessary bonds and other surety obtained, he shall issue a permit therefor to the owner.

---

communication will be acted on; (2) the person seeking to assert estoppel, who lacks knowledge of the facts, relies upon that communication; and (3) the person relying would be harmed materially if the actor is later permitted to assert a claim inconsistent with his earlier conduct." *Gen. Elec. Credit Corp. v. Strickland Div. of Rebel Lumber Co.*, 437 So. 2d 1240, 1243 (Ala. 1983) (citing *Mazer v. Jackson Ins. Agency,* 340 So. 2d 770, 773 (Ala.1976)).

Under Alabama law, "the doctrine of estoppel is rarely applied against a municipal corporation, [but] it may be applied in a proper case when justice and fair play demand it and where there has been a misrepresentation or concealment of material fact." *Town of Boligee v. Greene Cty. Water & Sewer Auth.*, 77 So. 3d 1166, 1172–73 (Ala. 2011) (quoting *Peterson v. City of Abbeville*, 1 So. 3d 38, 44 (Ala. 2008)).  In *Ex parte State Department of Human Resources*, for example, the Alabama Supreme Court held that the State Department of Human Resources was estopped from challenging the timeliness of a notice of appeal concerning the Department's denial of an application for disaster relief because the Department provided incorrect information to the plaintiff about the venue for appeal, causing the plaintiff's delay in filing a proper appeal. *Ex parte State Dep't of Human Res.*, 548 So. 2d 176, 177 (Ala. 1988).  The Alabama Supreme Court stated: "Unfairness in all degrees results from governmental changes of position," and estoppel prevents manifest injustice that would result if citizens could not rely on information provided to them by government entities. *State Dep't of Human Res.*, 548 So. 2d at 178–79.

General City Code §§ 4-7-24(a)–(b).  Michael Eddington, the City Engineer who replaced Mr. Hawkins, testified that to obtain a permit, individuals must submit permit applications and plans.  Generally, the City does not physically inspect a site but relies on the applicant's documentation.

Accordingly, North Face's clearing and grading permit did not constitute a representation from the City that the City approved North Face's grading procedures, control of the slope, or engineering calculations regarding the slope beneath North Face's construction above the City's retaining wall.  Additionally, there is no evidence that the City had superior knowledge of the impact of an historic rain event on a retaining wall that, as far as the City knew, had not been compromised in more than 50 years of average rain events.  Mr. Miree was aware of a crack in the wall below his construction, but he attributed the crack to a tree root, not slope stability factors, and he had North Face repair the crack without advising the City's inspectors of the crack or the repair.  Therefore, the City is not estopped from contending that North Face caused or contributed to the retaining wall's failure beneath North Face's construction by clearing vegetation from the slope and adding fill dirt.

*Takings*

North Face contends that the City of Birmingham violated the Takings Clause of the Fifth Amendment by conditioning the issuance of an occupancy permit for North Face's new apartment building on North Face's repair of the damage caused

15

by the global stability failure. (Doc. 26, pp. 4–5). The City argues that North Face's takings claim is "inherently flawed" and "based on an inaccurate premise." (Doc. 90, p. 8). According to the City, it "did not withhold the issuance of an occupational [sic] permit," and it "did not once deny North Face's application for an occupational [sic] permit." (Doc. 90, p. 8). Though the City did not deny an application for an occupancy permit, and North Face received an occupancy permit on August 15, 2019, (P's Ex. 23), the evidence demonstrates that the City delayed North Face's occupancy permit until the company completed the repairs, and an effort by North Face to request an occupancy permit from the City before the company repaired the damage to the City's wall and infrastructure would have been futile.

The section of the wall below North Face's construction failed on January 2, 2019. The City's January 18, 2019 letter to North Face was "an official demand" that North Face repair the city infrastructure. (P's Ex. 9). The letter included the text of Birmingham's General City Code § 4-5-40, which provides in relevant part:

> If, upon demand by the City Engineer . . . any such contractor, developer, or other party fails in 15 days thereafter to repair any such damage, the city may perform or have performed the repairs and demand reimbursement for the cost thereof and, further, refuse to thereafter issue permits to the defaulter so long as any such reimbursement to the city remains unpaid.

General City Code § 4-5-40(c). Mr. Miree testified that Mr. Hawkins told him that North Face would not receive an occupancy permit unless the company repaired the damage. According to Mr. Miree, Mr. Hawkins stated, "That's only leverage I got."

16

Mr. Hawkins does not recall that statement, but in North Face's June 30, 2019 letter to the City, Mr. Miree reported: "Although we objected, we had no choice but to proceed [with the repairs] in light of your vow to withhold an occupancy permit on our project adjacent [to] the city's right of way as the only leverage you had to force compliance." (P's Ex. 21). The City did not respond to the letter to dispute that characterization. Based on the record, the Court concludes that the futility exception to the final decision requirement applies in this case and that North Face's takings claim is ripe for review.[9]

The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to states through the Fourteenth Amendment, provides that a state may not take private property for public use "without just compensation." *Dolan v. City of Tigard*, 512 U.S. 374, 383–84 (1994) (quoting U.S. CONST. amend. V). The unconstitutional conditions doctrine forbids the government

_____

[9] For a takings claim "to be ripe for adjudication . . . [t]he landowner must obtain a final decision . . . ." from the government. *S. Grande View Dev. Co. v. City of Alabaster*, 1 F.4th 1299, 1305 (11th Cir. 2021) (citing *Eide v. Sarasota Cty.*, 908 F.2d 716, 720–21 (11th Cir. 1990)). Absent a final decision, a landowner must proceed under the futility exception to the ripeness requirement: "An exception to the final decision requirement exists where it would be futile for the plaintiff to pursue a final decision." *S. Grande View Dev. Co.*, 1 F.4th at 1308 n.12 (quoting *Strickland v. Alderman*, 74 F.3d 260, 265 (11th Cir. 1996)).

The City argues that North Face was not ready to apply for an occupancy permit in January 2019. Nevertheless, the City conditioned an occupancy permit on North Face's repair of the City's damaged infrastructure. The evidence demonstrates that North Face had completed 95% of its construction project in January 2019, and the company had a lease agreement with a tenant. (Doc. 91, p. 6 n.1). The City imposed a pricey condition for an occupancy permit when the City knew North Face soon would request a permit.

from denying benefits to an individual because he exercises his constitutional rights. The doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

Because "land-use permit applicants are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits," a "'special application'" of the unconstitutional conditions doctrine "protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits." *Koontz*, 570 U.S. at 604–05 (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 547 (2005)). "Extortionate demands" toggled to government-mandated property permits "frustrate the Fifth Amendment right to just compensation, and the unconstitutional conditions doctrine prohibits them." *Koontz*, 570 U.S. at 605. When applied in this context, an unconstitutional conditions claim "is its own constitutional cause of action . . . 'predicated on the Taking Clause.'" *Hillcrest Prop., LLP v. Pasco Cty.*, 915 F.3d 1292, 1299 (11th Cir. 2019) (quoting *Koontz*, 570 U.S. at 610).

But not all government-imposed conditions for permits run afoul of the unconstitutional conditions doctrine. Because "many proposed land uses threaten to impose costs on the public" that a local government must mitigate, the government may "condition approval of a permit" on mitigation expenses if "there is a 'nexus'

and 'rough proportionality' between the property that the government demands and the social costs of the applicant's proposal." *Koontz*, 570 U.S. at 605–06, 612 (citing *Dolan*, 512 U.S. at 391; *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987)). "Where a building proposal would substantially increase traffic congestion, for example, officials might condition permit approval on the owner's agreement to deed over the land needed to widen a public road." *Koontz*, 570 U.S. at 605. That type of condition is not an extortionate demand but a reasonable response to a burden associated with a permit application. Thus, under *Nollan* and *Dolan*, a government entity "may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development," but the government "may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." *Koontz*, 570 U.S. at 606.

Here, North Face had spent more than $2.2 million on its apartment construction when the section of retaining wall below its construction separated and damaged the adjacent city infrastructure. Because North Face already had invested significantly in its construction project, and the project was near completion, offering North Face the potential for significant earnings from paying tenants, the City's denial of an occupancy permit, which would render the new apartment building uninhabitable, would have cost North Face far more than the $588,124 that the company spent to repair the wall and the adjacent right of way. The City made

North Face an offer that the company could not refuse when the City conditioned an occupancy permit on North Face bearing the expense of the repairs.

Thus, as in *Koontz*, "the demand for money at issue here did 'operate upon . . . an identified property interest' by directing the owner of a particular piece of property to make a monetary payment." *Koontz*, 570 U.S. at 613 (quoting *E. Enters. v. Apfel*, 524 U.S. 498, 540 (1998)).  The condition that the City imposed for the occupancy permit arguably diminished the value of North Face's property by nearly $600,000.  The question, then, is whether that condition was justifiable because there was a "nexus" and "rough proportionality" between the $600,000 condition and the social costs of North Face's construction.[10]

The answer is yes, an "essential nexus" exists between the City's legitimate state interest in protecting the health, safety, and welfare of its residents and the permit condition for repair of damage caused by the global stability failure.  An occupancy permit confirms that premises meet certain standards and that property is safe to occupy.   North Face acknowledged that the global stability failure "jeopardize[d] the stability" of its apartment building.  (P's Ex. 10).  North Face had

---

[10] The $600,000 price tag for repairs to the wall and adjacent street is not arguable, but the detrimental impact of the repair expense on the value of North Face's property is arguable.  As discussed next, absent the repairs, North Face would have had trouble leasing its apartments because the damaged roadway provided access to garbage collection and emergency vehicles, and the retaining wall helped stabilize the hill on which North Face's apartment complex sits.  Thus, both North Face and the City reaped a benefit from the investment that North Face made to secure an occupancy permit.  North Face improved its ability to receive income from its property.  This situation is distinct then from government takings for which a permit applicant receives no return.

to stabilize the foundation of the apartment building before the building could be occupied.   Necessarily, then, repairing the retaining wall and stabilizing the property's slope advanced the City's interest in protecting the safety of its residents. Similarly, repairing the damage to the City's right of way was related to the City's interest in health and safety.   Vehicles, including emergency vehicles and garbage collection services, could not access the damaged portion of the roadway, even though Mr. Miree testified that vehicles could still access the property via other roads.   In his deposition, Mr. Hawkins testified:

> [T]here would have been no way we could issue a CO to that building with those life/safety conditions. . . . [T]here could not have been a certificate of occupancy with a destroyed road below it and a front yard that was falling in. . . . [N]obody could have issued that.   It is a life/safety issue.

(Doc. 90, pp. 11–12).   Therefore, a nexus exists between the City's interest in health and safety and the condition it imposed on North Face's occupancy permit.

The proportionality test asks "whether the degree of the exactions demanded by the city's permit conditions bears the required relationship to the projected impact of petitioner's proposed development."  *Dolan*, 512 U.S. at 388 (citing *Nollan*, 483 U.S. at 834).   "No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development."  *Dolan*, 512 U.S. at 391.  This case diverges slightly from the typical rough proportionality

analysis because the analysis here looks backward rather than forward.  As discussed, at the time of the global stability failure, North Face had completed approximately 95% of its construction project; the company needed an occupancy permit rather than a building permit.  Instead of relating the permit condition to the impact of proposed development, the City related the permit condition to what it considered the actual impact of development, measured by the extent of damage from the global stability failure and the cost of repairing the damage.

It is undisputed that the City, post-failure, made no attempt to determine from an engineering standpoint precisely what caused the section of retaining wall beneath North Face's construction to fail.  In its demand letter, the City indicates that "[c]ontributing factors causing damage to city infrastructure may include but are not limited to" six enumerated bullet points, including "[c]learing of all vegetation including large trees and ground cover above the retaining wall" and "[p]lacing additional fill [dirt] above the retaining wall."  (P's Ex. 9).  Mr. Hawkins testified that before sending the letter, the City did not retain an independent engineer to perform analysis on the cause of the wall failure, and the City did not perform internal engineering analysis on the cause of the wall failure.  The City did not know whether the retaining wall had weep holes or whether the weep holes were functioning properly.

But the City did know that only one section of its retaining wall failed during an historic rainfall, and that section was directly below a slope from which North Face had cleared vegetation and along which North Face had added fill dirt. The City also knew that its wall did not crack or crumble or topple over; its wall slid forward into the street. And the slope and wall had to be repaired quickly to prevent further damage. The City wasted no time making a demand upon North Face because there was no time to waste.

The City did not ask North Face to rebuild the entire wall. The City did not demand a particular design or insist that a company other than Mr. Miree's company perform the work at a premium. The City asked only for the damage caused by the slope failure to be remedied.

Because the City's condition for North Face's occupancy permit satisfies the nexus and proportionality tests, the Court finds for the City on North Face's Fifth Amendment takings claim.

*Substantive due process*[11]

---

[11] North Face has not indicated whether it brings its due process claim under substantive or procedural due process. (Doc. 26, p. 6). North Face alleges that the "City's decision to withhold North Face's occupancy permit was arbitrary and capricious and was not a proper exercise of the City's police power." (Doc. 26, p. 6, ¶ 32). The City addressed substantive due process in its motion for judgment as a matter of law, (Doc. 90, pp. 9–10); North Face responded with procedural due process arguments, (Doc. 91, pp. 12–13). To the extent that North Face brings a claim for substantive due process, that claim fails as a matter of law for the reasons described in this section.

"The Due Process Clause of the Fourteenth Amendment provides, 'No state shall . . . deprive any person of life, liberty, or property, without due process of law.'" *Hillcrest*, 915 F.3d at 1297 (quoting U.S. CONST. amend. XIV, § 1). "[S]ubstantive due process has two strands—one that protects against deprivation of fundamental rights and one that protects against arbitrary legislation." *Hillcrest*, 915 F.3d at 1297. Fundamental rights are "implicit in the concept of ordered liberty" and are rights created by the Constitution. *Greenbriar Vill., L.L.C. v. City of Mountain Brook*, 345 F.3d 1258, 1262 (11th Cir. 2003) (quoting *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc) and citing *DeKalb Stone, Inc. v. Cty. of DeKalb*, 106 F.3d 956, 959 n.6 (11th Cir. 1997) (per curiam)). On the other hand, "land use rights, as property rights generally, are state-created rights." *DeKalb Stone, Inc.*, 106 F.3d at 959 (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).[12] Therefore, "there is generally no substantive due process protection for state-created property rights." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1279 (11th Cir. 2014).[13]

---

[12] "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Roth*, 408 U.S. at 577.

[13] The Eleventh Circuit has held that because substantive due process is an unenumerated right, "*Koontz* does not apply to substantive due process, as it does to the Takings Clause or to other enumerated constitutional rights." *Hillcrest*, 915 F.3d at 1299.

The other strand of substantive due process protects individuals from "arbitrary and irrational government action" when "state-created rights are infringed by a legislative act." *Hillcrest*, 915 F.3d at 1299 (quoting *Kentner*, 750 F.3d at 1279–80) (internal quotations omitted).   Local governing bodies often act in both legislative and executive capacities.   *Kentner*, 750 F.3d at 1280 (citing *Lewis v. Brown*, 409 F.3d 1271, 1273 (11th Cir. 2005)).   Executive actions are typically "ministerial or administrative" and "apply to a limited number of people." *Kentner*, 750 F.3d at 1280 (citing *McKinney*, 20 F.3d at 1557 n.9).   In contrast, legislative actions generally involve policy-making and "apply to a larger segment of—if not all of—society." *Kentner*, 750 F.3d at 1280 (citing *DeKalb Stone, Inc.*, 106 F.3d at 959 and quoting *McKinney*, 20 F.3d at 1557 n.9).   Substantive due process does not apply to state-created rights infringed by executive acts, and "as-applied violations are always executive because the executive is responsible for applying, or enforcing, the law." *Hillcrest*, 915 F.3d at 1301.   As a result, "an as-applied challenge to a land-use statute never gives rise to a substantive-due-process claim when the sole basis for the challenge is allegedly arbitrary behavior that does not infringe on a fundamental right." *Hillcrest*, 915 F.3d at 1302.

Neither strand of substantive due process provides North Face with a cause of action.   North Face contends that it "has a property right in its occupancy permit and it was entitled to be issued that permit without the City's coercive actions which

forced North Face to repair the City's defective retaining wall and attendant damage to the City's street, gutter, curb and sidewalk." (Doc. 26, p. 6, ¶ 31). North Face therefore concedes that the City's actions implicate a potential state-created property right in the occupancy permit. Because the right to the occupancy permit is not created by the United States Constitution, it is not a fundamental right protected by substantive due process. *See Greenbriar Vill., L.L.C.*, 345 F.3d at 1262 ("[T]o the extent that [the plaintiff] predicates its substantive due process claim directly on the denial of its state-granted and [] defined property right in the permit, no substantive due process claim is viable.") (citing *McKinney*, 20 F.3d at 1560).

In some circumstances, substantive due process may protect against "arbitrary and irrational" government legislative action. But here, the City's decision to condition the occupancy permit on completed repairs to the retaining wall and 16th Avenue South was an executive action. North Face voluntarily dismissed its claim challenging General City Code § 4-5-40 on its face, and it instead challenges the City's use of that code within the demand letter to withhold the occupancy permit until North Face completed the repairs. This decision applies only to North Face in the limited context of the retaining wall failure, and it is not applicable to any broader segment of society. *See Kentner*, 750 F.3d at 1280. Moreover, as-applied violations are "always executive." *Hillcrest*, 915 F.3d at 1301. Therefore, "regardless of how arbitrarily or irrationally the [City] has acted with respect to [North Face], [North

26

Face] has no substantive-due-process claim." *Hillcrest*, 915 F.3d at 1302.   Any

violation of due process by the City will sound in procedural due process.

*Procedural due process*

Procedural due process is a "guarantee of fair procedure." *Zinermon v. Burch*,

494 U.S. 113, 125 (1990).   In § 1983 procedural due process claims, "the deprivation

by state action of a constitutionally protected interest in 'life, liberty, or property' is

not in itself unconstitutional; what is unconstitutional is the deprivation of such an

interest *without due process of law*." *Zinermon*, 494 U.S. at 125 (emphasis in

*Zinerman*).   In the Eleventh Circuit, a plaintiff must establish:   "(1) a deprivation of

a constitutionally-protected liberty or property interest; (2) state action; and (3)

constitutionally-inadequate process." *Kessler v. City of Key West*, No. 21-11069,

2022 WL 590892, at * 3 (11th Cir. Feb. 28, 2022) (quoting *Grayden v. Rhodes*, 345

F.3d 1225, 1232 (11th Cir. 2003)).   Additionally, courts examine: "(1) whether there

is enough of a property interest at stake to be deemed 'protectable'; (2) the amount

of process that should be due for that protectable right; and (3) the process actually

provided, be it before or after the deprivation." *Greenbriar Vill., L.L.C.*, 345 F.3d

at 1264 (citing *Tri-Cty. Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 436 (4th Cir. 2002)).

Procedural due process typically requires adequate notice and an opportunity to be

heard. *Greenbriar Vill., L.L.C.*, 345 F.3d at 1264 (citing *Mullane v. Cent. Hanover

Bank & Trust Co.*, 339 U.S. 306, 314–16 (1950)).

North Face contends:

> The City provided no pre-deprivation process by which North Face
> could be heard or otherwise challenge the withholding of the occupancy
> permit. Nor did the City provide any post-deprivation process. Instead,
> the City withheld North Face's occupancy permit without allowing
> North Face to contest the propriety of that withholding and refused to
> issue the permit until North Face completed the repair work the City
> improperly demanded.

(Doc. 26, p. 6, ¶ 34). The City argues that "North Face never requested a hearing or

requested to reconsider before the Director of Planning, Engineering and Permits,

City Council or even the Mayor's Office. Occupancy permits are given once the

project is completed. Mr. Miree received the occupancy permit . . . upon request."

(Doc. 90, p. 11).

The parties assume North Face possessed a protected property interest in the

occupancy permit. The Eleventh Circuit has noted that when there is uncertainty in

the existence of a property right, "[t]he determining factor in such cases may be

whether the permit-issuing government authority lacks discretion to deny the permit

on which the plaintiff bases his property right." *Greenbriar Vill., L.L.C.*, 345 F.3d

at 1266; *see also Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)

("Usually, entitlement turns on whether the issuing authority lacks discretion to deny

the permit, *i.e.*, is required to issue it upon ascertainment that certain objectively

ascertainable criteria have been met."). The parties have not presented evidence

regarding whether the City retained discretion to deny the occupancy permit if all requirements were met.

The Court finds the reasoning of the Second Circuit persuasive:

[T]he question of whether an applicant has a legitimate claim of entitlement to the issuance of a license or certificate should depend on whether, absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted. Otherwise the application would amount to a mere unilateral expectancy not rising to the level of a property right guaranteed against deprivation by the Fourteenth Amendment.

*Sullivan v. Town of Salem*, 805 F.2d 81, 85 (2d Cir. 1986) (quoting *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 59 (2d Cir. 1985)).  In addition, the Seventh Circuit has held that a property interest may exist in an occupancy permit where denial would result in the inability to occupy the premises for any purpose.  *See Polenz v. Parrott*, 883 F.2d 551, 557 (7th Cir. 1989).  Here, North Face already received a building permit, (P's Ex. 6), and a "soil erosion permit (clearing and grading)," (P's Exs. 4, 5), after submitting permit applications and appropriate documentation.  The Birmingham Department of Planning, Engineering, and Permits has a seven-step process for obtaining a building permit; receiving a certificate of occupancy is the final step.  The Court concludes that North Face possessed a protectable property interest in the occupancy permit.

The parties do not dispute that North Face received adequate notice of the City's determination that North Face was responsible for the damage and that North

Face needed to complete the repairs before it could obtain an occupancy permit. Instead, North Face contests the lack of pre-deprivation and post-deprivation process.  The plain text of General Code § 4-5-40 does not provide for pre-deprivation or post-deprivation hearing procedures.  The City's demand letter to North Face did not include a way to challenge the City's determination that North Face was at fault for the wall failure.  The letter concluded:  "Please provide a plan repair / replacement and schedule for completing the required work for review and acceptance by the city.  See section 4-5-40 from the city code below.  This is an official demand that you repair the city infrastructure." (P's Ex. 9).  Though North Face immediately contested responsibility and informed the City that it would look for reimbursement after completing the repairs, the City did not offer a post-deprivation procedure.  Mr. Hawkins, the City engineer at the time, testified that he was not aware of a formal procedure to challenge the determination under § 4-5-40 and obtain a hearing before the City.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  "In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." *Zinermon*, 494 U.S. at

132 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)).  A pre-deprivation hearing of some kind was feasible and necessary before the City decided to withhold North Face's occupancy permit until North Face completed the repairs.[14] North Face's interest in the occupancy permit was significant, and the time and resources invested in the property would have become worthless without an occupancy permit allowing the operation of the apartment building.  Moreover, there was a high risk of erroneous deprivation without formal procedures.  Following the wall failure in January 2019, the causes of the global stability failure (besides the torrential rainfall) were unclear and disputed by the parties.  The City determined that North Face was entirely at fault for the damage and decided to withhold an occupancy permit on that basis without offering North Face a formal opportunity to be heard.  Unquestionably, City also had a significant interest in repairing its infrastructure as soon as possible and in not issuing an occupancy permit for an unsafe property, but the City's interest does not justify the complete lack of formal

---

[14] Because the Court holds that a pre-deprivation procedure was feasible and necessary, it does not reach the issue of whether Alabama state law could provide an adequate post-deprivation remedy. *See McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994).  This avoids "gutting any notions of predeprivation due process and blanketly holding that a state can effectuate any and all deprivations under a 'shoot first, ask questions later' mentality, so long as it offers *ex post facto* recourse." *Barr v. Johnson*, 777 Fed. Appx. 298, 303 (11th Cir. 2019); *see also Carcamo v. Miami-Dade Cty.*, 375 F.3d 1104, 1105 n.4 (11th Cir. 2004) ("[T]he acceptability of post-deprivation process turns on the feasibility of pre-deprivation process . . . ."); *Edwards v. Dothan City Schools*, No. 1:21cv248-ECM, 2022 WL 601760, at *3–4 (M.D. Ala. Feb. 28, 2022).

procedures because the City could have provided some kind of appeal process without unreasonably delaying repairs.

Nominal damages are available for violations of procedural due process. *See Carey v. Piphus*, 435 U.S. 247 (1978), but the Court will not award nominal damages here. Evidence in the record indicates that North Face was not in a position to delay repairs to the retaining wall and adjacent infrastructure to challenge the City's findings through a formal appeal process if the City had offered one. North Face, at minimum, needed "to take immediate emergency steps to stabilize [its] building," (P's Ex. 10), and the sooner North Face completed the project and gained an occupancy permit, the sooner it could collect rent from paying tenants. By moving forward with the necessary repairs, North Face controlled the materials and the timeline for the repairs, securing its highest financial interests. North Face chose its process, and the Court will not award nominal damages to the company on the record in this case.[15]

---

[15] Importantly, there was not a significant power imbalance between the parties. Mr. Miree has extensive experience with construction projects and a close working relationship with the City. The parties informally worked through the wall failure by meeting four to five times on site, meeting at the City's office two or three times, and exchanging several phone calls. Mr. Miree knew how to challenge the City's decision. He simply chose to begin the process of challenging the City's decision after he secured the economic well-being of his company's investment in its new construction.

*Unjust enrichment*

"To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that:  (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *Portofino Seaport Vill., LLC v. Welch*, 4 So. 3d 1095, 1098 (Ala. 2008) (citing *Am. Family Care, Inc. v. Fox*, 642 So. 2d 486, 488 (Ala. Civ. App. 1994)).  The plaintiff must establish that:

> the defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud.  The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another.

*Mantiply v. Mantiply*, 951 So. 2d 638, 654 (Ala. 2006) (quoting *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1123 (Ala. 2003)) (internal quotations, emphasis, and citations omitted).

"'One is unjustly enriched if his retention of a benefit would be unjust.' *Jordan v. Mitchell*, 705 So. 2d 453, 458 (Ala. Civ. App. 1997) (citing *Restatement of Restitution:  Quasi Contracts and Constructive Trusts*, § 1, Comment c. (1937)). The *Jordan* court continued:

> Retention of a benefit is unjust if (1) the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the

absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been *unjustly* enriched."

*Matador Holdings, Inc. v. HoPo Realty Invs., L.L.C.*, 77 So. 3d 139, 145–46 (Ala. 2011) (quoting *Welch v. Montgomery Eye Physicians, P.C.*, 891 So. 2d 837, 843 (Ala. 2004)) (emphasis in *Welch*).  "The success or failure of an unjust-enrichment claim depends on the particular facts and circumstances of each case." *Mantiply*, 951 So. 2d at 655 (citing *Heilman*, 876 So. 2d at 1123).

The City accepted the benefit of North Face's completed repairs to city infrastructure, and North Face had a reasonable expectation of compensation.  North Face immediately disputed responsibility for the wall failure, and in its response to the City's demand letter, North Face stated:  "While we will be forced to bear the cost of this work initially, we will look to the City for reimbursement if our position is ultimately found to be correct."  (P's Ex. 10).  In the immediate aftermath of the wall failure, there was ambiguity over which party was responsible, and time was of the essence in completing the necessary repairs—both with respect to public safety and to North Face's ability to complete its construction project.  North Face's plan to complete the repairs and later seek reimbursement was reasonable, and the company clearly conveyed its expectation to the City.

However, though the City was enriched by this series of events, under Alabama law, North Face has not demonstrated that the City was *unjustly* enriched.

34

North Face did not act under a mistake of fact or in misreliance on a right or duty, and the City's actions do not rise to the level of unconscionability.  Though the City erred by not providing an adequate formal procedure to challenge its determination, the City did not commit intentionally wrongful acts such as fraud, coercion, or abuse of a confidential relationship.  The City seems to have acted with the genuine belief that North Face was at fault for the wall failure, and the City also acted in the interest of public safety and welfare by encouraging North Face to remedy the dangerous conditions.[16]  North Face has not established that the City was unjustly enriched.

*Duty of Lateral Support*

"[A]n adjoining landowner is entitled to lateral support for his land in its natural state."  *Nichols v. Woodward Iron Co.*, 103 So. 2d 319, 321 (Ala. 1958) (collecting authority).  This principle does not extend to land that has been modified through the addition of houses or other buildings since those structures increase the pressure of land on the adjoining soil.  *See Moody v. McClelland*, 39 Ala. 45, 49 (Ala. 1863).  "Yet, if a person making a lawful excavation on his own land, performs the work so negligently and unskillfully that injury thereby results to the land or house of an adjacent proprietor, he is liable to an action for damages at the suit of the injured person."  *Nichols*, 103 So. 2d at 322 (quoting *Myer v. Hobbs*, 57 Ala. 175, 177 (Ala. 1876)).

---

[16] The Court has found that North Face contributed to the global stability failure.

The Alabama Pattern Jury Instructions provide:

> [T]here are situations when a person may be responsible for harm to his neighbor's land that is not in its natural state. This situation happens if the person conducts a lawful activity on his land; negligently performs the activity and causes harm to his neighbor's land and the structures on it; and the added weight of the structures on the land did not contribute to the harm.

2 Ala. Pattern Jury Instr. Civ. 31A.04 (3d ed.).  To prevail on its claim under the pattern jury instructions, North Face must establish that its and the City's lands join, that the retaining wall built by the City weakened or destroyed the lateral support for North Face's land, that North Face's townhomes on North Face's land did not increase the lateral pressure on the City's land, and that the City negligently failed to design, construct, and/or maintain its retaining wall and that the City's negligent conduct caused harm to North Face's land and townhomes.

North Face has not established that the City is responsible for the damage to North Face's land and townhomes.  There is no evidence in the record that indicates how the retaining wall was built or to what standards it was designed.  The City's retaining wall remained standing for 50–60 years through rain events.  The only section of the City's retaining wall that failed during the rain event in January 2019 was the section directly below North Face's construction project.  The Court has found that North Face's construction activities contributed to the global stability

failure.  Consequently, North Face's claim against the City for breach of the duty of lateral support fails.[17]

### *Conclusion*

For the reasons explained above, the Court concludes that the City of Birmingham violated North Face's procedural due process rights, but the Court declines to award nominal damages.  The Court rules in favor of the City of Birmingham on North Face's remaining claims.

**DONE** and **ORDERED** this July 12, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

_____

[17] The City contends that it is entitled to substantive immunity, but it does not specify as to which claims.  (Doc. 90, p. 17).  Substantive immunity is an Alabama state doctrine that "applies to those public service activities of municipalities 'so laden with the public interest as to outweigh the incidental duty to individual citizens.'"  *Ex parte City of Tuskegee*, 295 So. 3d 625, 640 (Ala. 2019) (quoting *Hilliard v. City of Huntsville*, 585 So. 2d 889, 891 (Ala. 1991), in turn quoting *Rich v. City of Mobile*, 410 So. 2d 385, 387–88 (Ala. 1982)).  Because the Court has resolved the state law claims in the City's favor, it does not reach the substantive immunity argument, but the Court notes that the doctrine is usually applied in the context of negligence claims resulting from a breach of a duty owed to the general public.  *See Bill Salter Advert., Inc. v. City of Atmore*, 79 So. 3d 646, 652 (Ala. Civ. App. 2010).